## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**STORCO, LLC,**

     Plaintiff,

     v.

**851 ALEXIS LLC,**

     Defendant.

CASE NO. 3:23 CV 652

JUDGE JAMES R. KNEPP II

**MEMORANDUM OPINION AND ORDER**

### INTRODUCTION

Currently pending before the Court is Defendant 851 Alexis LLC's Motion for Summary Judgment (Doc. 15). Defendant moves for judgment in its favor on the breach of contract claim asserted in its counterclaim (Doc. 8), and the breach of contract claim brought by Plaintiff StorCo, LLC. (Doc. 1). Plaintiff opposed (Doc. 25), and Defendant replied (Doc. 26). Jurisdiction is proper under 28 U.S.C. § 1332. For the following reasons, the Court denies 851 Alexis's Motion.

### BACKGROUND

Viewed in the light most favorable to StorCo, the available evidence demonstrates the following facts.

The Purchase and Sale Agreement

On May 9, 2022, James Reid, the president of StorCo, LLC ("StorCo"), entered into a Purchase and Sale Agreement (the "PSA") with 851 Alexis LLC ("851 Alexis"), to purchase 851 West Alexis Road in Toledo, Ohio (the "Property"). (Doc. 25-1, at ¶ 3); *see also* Doc. 20. StorCo planned to use the Property as a self-storage facility. (Doc. 25-1, at ¶ 4). During the purchase process, StorCo primarily dealt with Matthew DeWood, a member of 851 Alexis. (Doc. 17, at ¶

2). The purchase price was $3.2 million with a deposit of $175,000 to be held in escrow with

Midland Title and Escrow Ltd. (Doc. 20, at §§ 3,6). The PSA contained the following language:

3. **Deposit:**

a. Within five (5) Business Days following the Effective Date, Buyer shall deposit with Midland Title and Escrow Ltd., 401 Adams Street, Toledo, Ohio 43604 (the "***Title Company***") the sum of One Hundred Seventy Five Thousand and 00/100 Dollars ($175,000.00) (together with any interest earned thereon, the "***Initial Deposit***" and, collectively with any additional deposits made as contemplated herein, the "***Deposit***").

b. Except as otherwise described in this Agreement, the Title Company shall retain the Deposit until the Closing occurs, in which case the Deposit shall be applied to the Purchase Price and delivered to Seller. The Deposit is fully refundable to Buyer if Buyer terminates this Agreement prior to the end of the Inspection Period. If Buyer does not terminate this Agreement prior to the end of the Inspection Period, the Deposit shall be deemed non-refundable and be payable to Seller, except in the event of a Seller default.

*Id.* at § 3.

4. **Inspection Period:** Buyer may conduct any and all inspections, investigations, surveys, studies, testing, analysis, and assessments, all as more particularly described in this Section 4.

a. **Inspection Period Timing:** The "Inspection Period" will commence on the Effective Date and shall end forty five (45) days thereafter unless otherwise extended as provided herein. If prior to the end of the Inspection Period Buyer has notified Seller that Buyer is not satisfied with the Property, ***for any reason or no reason***, this Agreement shall be deemed terminated as of the expiration of the Inspection Period, or the date of Buyer's notification, whichever is earlier, and the Title Company shall return the Deposit to Buyer. If Buyer has not notified Seller that Buyer is not satisfied with the Property prior to the end of the Inspection Period, then Buyer shall be deemed to have found the Property acceptable, the Deposit shall be deemed non-refundable and be payable to Seller (except in the event of a Seller default) and the parties shall proceed to closing.

b. **Extension of Inspection Period:** Buyer shall have the right to extend the Inspection Period for an additional 30-day period, by providing Seller written notice thereof prior to the end of the Inspection Period and by depositing with the Title Company Twenty Thousand and 00/100 Dollars ($20,000.00) for such extension. Any amount so deposited,

2

together with the Initial Deposit of $175,000 shall be considered a portion of the Deposit and shall automatically be deemed non-refundable and shall either be applied against the Purchase Price at Closing or be payable to Seller as provided for herein, except in the event of a Seller default.

*Id.* at § 4 (emphasis added).

8. **Notices:** All notices, consents, requests, demands, and other communications hereunder are to be in writing and are deemed to have been duly given or made: (a) when delivered in person; (b) three (3) days after deposited in the United States mail, first class postage prepaid; (c) in the case of overnight courier services, one (1) Business Day after delivery to the overnight courier service with payment provided for; or (d) when delivered by electronic mail, in each case addressed to the recipient at their address set forth in Section 1 or to such other address as any party may designate by written notice to the other party in accordance with the terms of this Section[.]

*Id.* at § 8.

14. **Default; Remedies**: In the event Buyer or Seller shall become in default of any material term or condition of this Agreement (other than the failure or refusal to close upon the Closing Date as to which no notice or cure rights shall exist), then prior to either party exercising its rights or remedies permitted under this Agreement, the party claiming such default ("***Non-Defaulting Party***"), shall notify the other party ("***Defaulting Party***") in writing, setting forth in reasonable detail the nature of such default. The Defaulting Party shall then have five (5) Business Days after receipt of such notice in which to cure such default. In the event of an uncured default by Seller under this Agreement prior to Closing, Buyer may either (a) terminate this Agreement and receive the return of the Deposit and seek reimbursement for Buyer's actual out of pocket due diligence expenses incurred up to $20,000, or (b) seek specific performance of Seller's obligations hereunder. In the event of material breach of Seller's representations and warranties under Section 9 of this Agreement after Closing but prior to the expiration of the Survival Period, then, after five (5) Business Days' notice to Seller and opportunity to cure, Buyer may seek an action against Seller for Buyer's actual, out of pocket losses incurred as a result of such Seller breach. Said Buyer right of action under the immediately preceding sentence shall automatically terminate without execution of any further instruments upon the expiration of the Survival Period.

If Buyer shall default in the payment of the Purchase Price or in the event of any other uncured default by Buyer hereunder, then, except as otherwise expressly provided for herein, Seller's sole and exclusive remedy for Buyer's default shall be to retain the Deposit as liquidated damages, it being agreed that the damages by reason of Buyer's default are difficult, if not impossible, to ascertain, and whereupon this Agreement will terminate and Buyer and Seller shall have no

3

further rights or obligations under this Agreement except for those that are expressly provided in this Agreement to survive the termination hereof.

*Id.* at § 14.

The Operation and Easement Agreement Warehouse Prohibition

The property at issue was subject to an Operation and Easement Agreement ("OEA") that prohibited the property from being used as a warehouse. Consequently, before StorCo could use the Property as a storage warehouse, it needed to obtain an amendment from the adjacent property owners to lift this restriction. (Doc 25-1. at ¶ 5) (the "OEA Amendment"). These owners, as recorded in the OEA with Lucas County, include Kroger Co. as to Lots 1 & 6, McDonald's Corp. as to Lots 2 & 3, Dayton Hudson Corp. (a/k/a Target) as to Lot 4, PDQ Israel Family Northtowne LLC as to Lot 5, and 851 Alexis LLC (Defendant) as to Lot 7. (Doc. 21, at 4) (hereinafter the "Owners").

The First Amendment to the Purchase and Sale Agreement

On June 23, 2022, the parties executed a First Amendment to extend the inspection period to allow StorCo to continue to seek permission from the Owners to remove the warehouse prohibition until September 21, 2022, at 5:00 p.m. (Doc. 25-1, at ¶¶ 6-7; Doc. 21, at § 2a). The First Amendment contains the following clause:

WHEREAS, Buyer has requested to amend the Agreement for Buyer to seek all of the current parties (i.e., all of the owners of property within the North Towne Commons Shopping Center listed on attached Exhibit "A" (the "Owners")) to the Operation and Easement Agreement recorded as Deed Record 89-0138-A04 in the Lucas County, Recorders Office. (the "OEA") to execute a recordable written amendment to the OEA (the "OEA Amendment") to remove the "warehouse operation" prohibition under Section 5.1(B)(ii) and expressly allow for the operation of the Property for use as a mini-warehouse (self-storage facility) operation (the "OEA Condition"), and Seller is agreeable to such Buyer action under the following terms and conditions set forth below.

(Doc. 21, at 1).

4

2. <u>Amendment.</u> The Agreement is hereby amended as follows:

    a. Notwithstanding anything contained in the Agreement to the contrary, as used in the Agreement and any exhibit thereto, the term "Inspection Period" shall have the following meaning: a period commencing on the Effective Date and expiring at 5:00 p.m. Eastern on Wednesday, September 21, 2022, provided, however, the Inspection Period is extended for the sole and exclusive purpose for Buyer, at its sole cost and expense, to seek satisfaction of the OEA Condition from the Owners. **Buyer hereby expressly waives ANY AND ALL OTHER due diligence rights, conditions and contingencies under the Agreement, including, without limitation, inspection rights, rights of investigations, studies and testing, financing contingencies, zoning maters, other third-party approvals and consents, title matters, survey matters and environmental matters.**

*Id.* at § 2 (emphasis added). StorCo agreed to release $5,000 from escrow upon executing the

First Amendment. *Id.* at § 2(b).

<u>The Third Amendment to the Purchase and Sale Agreement[1]</u>

On September 21, 2022, the parties executed a Third Amendment to the PSA to extend the

Inspection Period to continue to seek permission to remove the warehouse prohibition until

December 20, 2022, at 5:00 p.m. (Doc. 25-1, at ¶ 7; Doc. 23, at 1). It contains the following:

    a. Notwithstanding anything contained in the Agreement to the contrary as used in the Agreement and any exhibit thereto, the term **"Inspection Period"** shall have the following meaning: a period commencing on the Effective Date and expiring at 5:00 o'clock p.m. Eastern on Tuesday, December 20, 2022, provided, however, the Inspection Period is extended for the sole and exclusive purpose for Buyer, at its sole cost and expense, to seek satisfaction of the O.E.A. Condition from the Owners.

                        ***

    c. Notwithstanding anything contained in the Agreement to the contrary, as used in the Agreement, and any exhibit thereto, the term, the term (sic) **"Closing Date"** shall mean the date that is the earlier of: (i) fifteen (15) days following the date the O.E.A. Amendment is recorded in the Office of the Lucas County Recorder of Deeds; or (ii) Friday, December 30, 2022.

---

1. On July 21, 2022, the Parties executed a Second Amendment to the PSA to allow 851 Alexis to temporarily lease the Property to Spirit Halloween prior to the anticipated closing.

d. The O.E.A. Amendment shall be prepared by Buyer, at Buyer's sole cost, and submitted to Seller for Seller's reasonable review and approval. Buyer shall diligently seek to secure the original, notarized signatures of the parties listed on the attached Exhibit "A" and keep Seller apprised of its efforts to do the same. Upon receipt of a fully executed and notarized O.E.A. Amendment, Buyer's counsel shall provide the original to Seller's counsel for recording with the Lucas County Recorder of Deeds.

(Doc. 23 at § 2).

Similarly to the First Amendment, StorCo agreed to disburse $5,000 to 851 Alexis upon execution of the Third Amendment. *Id.* at § 2(b). 851 Alexis asserts it never received this second payment authorized by the Third Amendment. (Doc. 17, at ¶ 4).

OEA Negotiations

DeWood states StorCo's broker told him "all of the OEA owners had agreed to the amendment but that one or two had demanded compensation and the cost to obtain their consent was around $500,000.00." (Doc. 26-1, at ¶ 5); (DeWood Depo., at 69).[2] The evidence shows StorCo received financial demands from Target ($400,000) and Kroger ($75,000), and both demanded a reduction in the parking lot ratio to waive the warehouse prohibition. (Doc. 25-1, at ¶¶ 10-12). Reid, acting on behalf of StorCo, never accepted either proposal. *Id.* at ¶ 13. 851 Alexis offered to reduce the purchase price from $3.2 million to $2.7 million to offset the Owners' demands. *Id.* at ¶ 15. StorCo offered $2.3 million, which 851 Alexis did not accept. *Id.* at ¶ 16.

On December 14, 2022, Tim McFarland, StorCo's real estate agent, emailed Duke Wheeler, 851 Alexis's real estate agent, concerning the OEA Amendment. *See* Doc. 16. In the email, McFarland attached a copy of the Third Amendment and stated:

Seller has already reviewed and approved the initial draft of the OEA Amendment so to the extent they no longer have a copy, see attached. The basic terms of the negotiated concessions are; reduce parking to 3.5 per 1000 sq. ft.; increase Target

---

2. Matthew DeWood's deposition is located at ECF Doc. 24.

allowable building size; and allow mini-warehouse use on Lot 7. We can provide them with a revised draft with those negotiation concessions after a PSA amendment is executed.

Drafting the amendment won't take long. We could have that ready in the next day or two. Circulating may take some time especially for Target and Kroger. To be safe, I think we'd need about 45-60 days to secure the execution and return of the OEA Amendment from the various parties, but with the holidays coming up, it almost would be better if we could get the 45-60 days to start on January 3, it being the first business day of the new year.

(Doc. 16, at 4).

Termination of the PSA

StorCo attaches an Affidavit of Tim McFarland, StorCo's real estate agent, that avers: "Between the evening of December 19, 2022, and 11:45 a.m. on December 20, 2022, I informed Duke Wheeler over the phone that StorCo was terminating the Purchase and Sale Agreement." (Doc. 25-2 at ¶ 10). He further states, "At 5:10 p.m. on December 20, 2022, I emailed a Notice of Termination to Duke Wheeler, as StorCo could not obtain an agreement from all Owners that were parties to the OEA to waive the prohibition against warehouses." *Id.* at ¶ 11. The email reads: "This communication represents [StorCo]'s timely notice that [StorCo] hereby exercises its right to terminate the Agreement. Such termination shall be and hereby is effective immediately." (Doc. 16, at 6). Wheeler then asked McFarland to forward the contact information for the Owners' representatives who were parties to the OEA in case DeWood "may decide to finalize the self storage matter on his own." (Doc. 25-2, at 4). Wheeler then forwarded McFarland's email and notice of cancellation to DeWood at 5:16 p.m. (Doc. 16, at ¶ 5).

**STANDARD OF REVIEW**

Summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, the Court must draw all inferences from the record

7

in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

## DISCUSSION

851 Alexis argues it is entitled to summary judgment on two independent grounds: (1) StorCo's notice of cancellation was not timely nor in the manner required by the PSA, and (2) StorCo no longer had a right to terminate at the time of its purported termination. StorCo asserts 851 Alexis's motion should be denied because (1) StorCo substantially complied with the notice of termination, (2) StorCo could still terminate for "any reason or no reason", and (3) the OEA Amendment was never satisfied. For the reasons below, the Court denies 851 Alexis's motion for summary judgment. The Court finds that (1) StorCo substantially complied with the termination requirements and (2) ambiguity exists regarding StorCo's termination rights.

<u>Substantial Compliance</u>

851 Alexis asserts StorCo waived any termination right when it sent the cancellation notice (1) ten to sixteen minutes after the December 20, 2022, 5:00 p.m. deadline set by the Third Amendment and (2) to 851 Alexis's real estate agent, rather than to 851 Alexis and its counsel, as required by the PSA. (Doc. 15, at 13-14). StorCo argues it substantially complied with the notice requirements when it informed 851 Alexis's representative of the termination during a phone conversation prior to the deadline, followed by sending written notice only ten to sixteen minutes after the deadline. (Doc. 25, at 8). Moreover, StorCo argues that time was not of the essence and that 851 Alexis did not incur any damages due to the late notice. *Id.* at 15.

> Substantial compliance is a concept that allows a party to enforce a contract where the party seeking enforcement has substantially complied with its terms. A nominal or trifling breach is excused. However, where the performance of a term is essential to the purpose of the contract, a default of that term is not excusable no matter how trifling.

*Sims v. Anderson*, 38 N.E.3d 1123, 1129 (Ohio Ct. App. 2015). Where a contract has been substantially performed, the contract price may be recovered, less damages for failure to perform strictly in compliance with the contract. *Corry v. Campbell*, 25 Ohio St. 134 (1874), *Creith Lumber, Inc. v. Cummins*, 163 Ohio St. 264 (1955). For the doctrine of substantial performance to apply, the unperformed duties must not destroy the value or purpose of the contract. *Fifth Third Bank v. Ducru Ltd. Partnership*, 2006-Ohio-3944, ¶ 18 (Ohio Ct. App.).[3]

As to notice, the PSA requires the following:

---

3. Ohio courts treat substantial compliance and substantial performance synonymously. "'[S]ubstantial compliance,' synonymous with the term 'substantial performance,' is defined as, '[t]he rule that if a good-faith attempt to perform does not precisely meet the terms of an agreement or statutory requirements, the performance will still be considered complete if the essential purpose is accomplished.'" *State v. Brooks*, 2013 WL 142625, at *6 (Ohio Ct. App.) (quoting Black's Law Dictionary, 9th Ed.).

8. **Notices:** All notices, consents, requests, demands, and other communications hereunder are to be in writing and are deemed to have been duly given or made: (a) when delivered in person; (b) three (3) days after deposited in the United States mail, first class postage prepaid; (c) in the case of overnight courier services, one (1) Business Day after delivery to the overnight courier service with payment provided for; or (d) when delivered by electronic mail, in each case addressed to the recipient at their address set forth in Section 1 or to such other address as any party may designate by written notice to the other party in accordance with the terms of this Section[.]

PSA at § 8. According to the PSA, StorCo was required to send notice of cancellation before December 20, 2022, at 5:00 p.m. to the email addresses in Section 1 of the PSA, which were Matthew DeWood's (Mattdewood@yahoo.com) and his counsel's (TKuhn@gkplaw.net). *See* PSA § 1. McFarland instead sent the notice of cancellation to Duke Wheeler (851 Alexis's real estate agent) at 5:10 p.m., and Wheeler then forwarded the notice to DeWood at 5:16 p.m. (Doc. 16, at 5-6); (DeWood Depo., at 62). In the email from McFarland to Wheeler, McFarland references "our conversation," which StorCo asserts took place before the deadline sometime between the evening of December 19, 2022, and 11:45 a.m. of December 20, 2022. (Doc. 25, at 8); (Doc. 25-2, at ¶ 10).

851 Alexis relies on *Lake Ridge Academy v. Carney*, 66 Ohio St. 3d 376 (1993), to argue the "only legally supportable conclusion is that, with regard to exercise of its option, plaintiff had not performed *at all*." (Doc. 15, at 13) (emphasis in original). In that breach of contract case, the defendant appealed the trial court's decision against him for his failure to timely cancel a tuition contract. *Id.* The defendant entered a contract to enroll his son at Lake Ridge for the 1989-1990 school year; the contract contained a provision that allowed the defendant to cancel the contract without penalty up until August 1, 1989. *Id.* at 376. The defendant sent a notice of cancellation dated August 1 and postmarked August 7; however, Lake Ridge did not receive the letter until August 14. *Id.* This Court finds *Lake Ridge* distinguishable from the case at bar for several reasons.

First, *Lake Ridge* involved a contract for tuition, which involved dynamic planning and staffing decisions, as opposed to here, a real estate purchase agreement which had spanned some number of months. Second, potential damages were identifiable in *Lake Ridge*, whereas 851 Alexis has not demonstrated any specific damages. Third, Lake Ridge received the notice of termination thirteen days after the deadline, compared to the minor delay of sixteen minutes in the instant case. Finally, the deadline in *Lake Ridge* never changed, while in the current case, the parties extended the dates multiple times.

### StorCo Informed 851 Alexis's Representative

851 Alexis argues StorCo failed to provide proper notice. (Doc. 15, at 13-14). StorCo contends the phone call between McFarland and Wheeler "established appropriate notice of termination." (Doc. 25, at 8). StorCo supports this assertion based on DeWood's deposition testimony, in which DeWood stated his relationship with Wheeler spanned several years and that he trusted Wheeler (DeWood Depo., at 13). DeWood stated most communication would pass through Wheeler and that Wheeler's communication with DeWood was "very good" *Id.* at 16-17. Any material information would be relayed to DeWood with a quick turnaround. *Id.* at 17. DeWood testified he did not recall receiving notice until Wheeler sent him the email. *Id.* at 62.

In assessing StorCo's compliance with the PSA, the Court considers whether StorCo's method of communication – calling instead of emailing – constitutes a nominal or trifling breach or essential to the purpose of the contract breach. *Sims*, 38 N.E.3d at 1129. In this instance, the purpose of the notification requirement was timely and accurate communication which was achieved through StorCo's phone call before the deadline. StorCo effectively informed 851 Alexis of its intent to terminate the contract without causing any harm or disadvantage to 851 Alexis.

11

Therefore, the deviation from emailing to calling can be regarded as a trivial breach and thus the Court finds StorCo substantially complied with the purpose of the PSA.

*Time was Not of the Essence*

851 Alexis argues that although a "time is of the essence" clause was not included, the Court should hold time was of the essence since the contract – as modified by the Amendments – established a definite date and time for performance. (Doc. 15, at 11). StorCo responds that neither the PSA nor subsequent Amendments included a provision or language that indicated time was of the essence. (Doc. 25, at 13). It further asserts the "undisputable circumstances surrounding the execution of the PSA and Amendments demonstrate time was not 'of the essence' in regard to performance". *Id.* at 14. StorCo cites the following examples to support its argument that time was not a critical element of the PSA:

- The PSA specified the "Inspection Period" would commence on the "Effective Date" and would end forty-five (45) days thereafter "unless otherwise extended as provided herein." (PSA, § 4a);
- The PSA initially gave StorCo the right to extend the Inspection Period for an additional thirty (30) day period. (PSA, § 4b);
- The First Amendment extended the Inspection Period until September 21, 2022. (First Amend., § 2a);
- The Third Amendment extended the Inspection Period until December 20, 2022 (Third Amend., § 2a);
- The Parties were contemplating a 45-60 day extension to begin on January 3, 2023 to circulate an OEA amendment. (MSJ #15. Pg. 17, McFarland Aff. ¶ 9);

*Id.* at 14-15.

"Ohio courts are split as to whether and when 'time is of the essence' may be implied in a contract." *Shelton v. Twin Twp.*, 30 N.E.3d 1047, 1054 (Ohio Ct. App. 2015). "[T]he time of performance specified in a contract is generally not of the essence. The parties can alter this rule by including an express stipulation in the contract, or the nature of the contract itself or the circumstances under which it was negotiated can show that the parties intended for time to be of

the essence." *Merritt v. Anderson*, 2009 WL 975749, at ¶ 25 (Ohio Ct. App.) (citing *Brown v. Brown*, 90 Ohio App.3d 781, 784 (1993)). "[T]he fact that a contract contains a specified date or deadline does not automatically make time of the essence." *SRW Environ. Servs., Inc. v. Dudley*, 2009 WL 2231867 (Ohio Ct. App.). And "even if time was not of the essence in a contract for the sale of realty, as originally made, it may be made so by the subsequent conduct of the parties." *Green, Inc. v. Smith*, 40 Ohio App. 2d 30, 37 (Ohio Ct. App. 1974). In *Lake Ridge*, the court held "[w]hen it is said that time is of the essence, the proper meaning of the phrase is that the performance by one party at the time specified in the contract or within the period specified in the contract is essential *in order to enable him to require performance from the other party.*" *Lake Ridge Academy*, 66 Ohio St. 3d at 378 (quoting 6 Williston on Contracts (3 Ed.1962) 181, Section 846) (emphasis in original).

The PSA, with its subsequent Amendments, does not contain a "time is of the essence" clause. The Court therefore analyzes the parties' conduct. *Green, Inc.*, 40 Ohio App. 2d at 37 ("[E]ven if time was not of the essence in a contract for the sale of realty, as originally made, it may be made so by the subsequent conduct of the parties."). Here, the parties' behavior, as evidenced by multiple extensions and contemplated adjustments to their timeline, indicates a shared understanding that strict compliance with specific deadlines was not paramount to their agreement.

The absence of explicit language stating that "time is of the essence" and the multiple adjustments to the deadlines point to an understanding that time was not of the essence. The doctrine of substantial compliance holds that a nominal or trivial deviation does not invalidate a contract unless the term breached is essential to the contract's purpose. *Sims*, 38 N.E.3d at 1129.

Thus, based on the lack of an explicit "time is of the essence" clause and the parties' behavior, minor deviations in timing will not render the termination as unenforceable.

*851 Alexis Did Not Establish Damages*

StorCo asserts 851 Alexis "cannot establish damages caused by receiving the Termination at either 5:10 or 5:16, instead of 5:00". (Doc. 25, at 8). StorCo points to the following exchange from DeWood's deposition:

Q. Is there any sort of financial loss related to being notified at either 5:10 or 5:16 as opposed to 5 o'clock?

A. Well, financial loss as it relates to three amendments, yes.

Q. Okay. But nothing related to the 10 or 16 minutes, whichever it may be?

A. Financial loss to who?

Q. To 851.

A. In what fashion?

Q. I guess, were there any opportunities that 851 missed out on between 5 o'clock and 5:16?

A. Well there's opportunity lost all along the way.

Q. But not related to the 10 or 16 minutes? I'm talking just strictly the time difference.

A. As it relates to the contract not going through, yea, there's financial loss.

Q. Right. But all that aside, I'm just talking – let's assume that 5 o'clock was timely You're notified at either 5:10 or 5:16. Is there any financial loss to quantify in that 16 minutes, either that 10 or 16 minutes?

A. I don't know how you talk about that when you have nine months of financial loss. I don't think you're conceptualizing it properly.
                                               ***

Q. So how would you quantify -- so quantify for me the loss between 5:00 and 5:16?

14

A. Multiple bidders at, you know 3.2 million that had good intentions.

Q. Did the multiple bidders come in between 5:00 and 5:16?

A. The multiple bidder were in the beginning and along the way.

Q. Okay. But not in that time – that time period between 5:00 and 5:10 or 5:16?

A. I did not get an offer between 5:00 and 5:10.

Q. That would be no offer between 5:00 and 5:16 as well?

A. Correct.

(DeWood Depo., at 63-66). The above exchange illustrates a lack of damages and further distinguishes this case's facts from those in *Lake Ridge*. There, the importance of the deadline was central to Lake Ridge's ability to budget for its school year:

> As the court of appeals explained, Lake Ridge goes through a long budgeting process which begins each year in January and ends in the fall. The tuition money paid by students is pooled and goes towards staff salaries and benefits, department budgets, student materials, maintenance, improvements, and utilities. Trial testimony reveals that the school budget process is often an uncertain science; it is quite clear that Lake Ridge would be unable to calculate and prove the precise damages caused by the loss of one student's tuition.

*Lake Ridge*, 66 Ohio St. 3d at 376. Here, 851 Alexis admits it did not suffer any concrete damages in the ten or sixteen minutes after the deadline when the notice was sent. (DeWood Depo., at 63-66). This lack of damages further suggests StorCo's late notice did not significantly undermine the purpose behind the December 20 deadline.

Considering the above issues collectively, although StorCo's notice of termination did not strictly adhere to the PSA's notice requirements, the Court finds StorCo substantially complied with the terms set forth and did not "destroy the value or purpose of the contract." *Fifth Third Bank v. Ducru Ltd. Partnership*, 2006-Ohio-3944, ¶ 18 (Ohio Ct. App.). The absence of damages incurred by 851 Alexis coupled with the absence of a "time is of the essence" clause and the history

of deadline extensions all support a conclusion that StorCo substantially complied with the value or purpose of the contract. Although notice was not given in the precise manner prescribed in the PSA, it was given clearly and timely enough to make StorCo's compliance substantially in line with the contract. 851 Alexis's motion for summary judgment based on any untimeliness of the purported termination notice is therefore denied.

Termination Rights

Next, 851 Alexis asserts that even if the termination notice was timely, "it was not grounded in sufficient cause to be effective." (Doc. 15, at 2). The parties' dispute centers around whether, and for what reasons, StorCo could terminate the PSA on December 20, 2022. 851 Alexis claims StorCo waived the provision in the PSA that it could terminate the PSA for "any reason or no reason" upon execution of the First Amendment. (Doc. 15, at 12). 851 Alexis further argues the First and Third Amendments provide the "sole purpose of the extension was to obtain the consent of the other owners to the amendment." *Id.* StorCo asserts that because the Amendments do not explicitly state a waiver of the "for any reason or no reason" language, it could still terminate for any or no reason. (Doc. 25, at 17). Additionally, StorCo asserts it validly withdrew from the PSA because the OEA Amendment was not satisfied. The Court finds that an ambiguity exists regarding whether the OEA Amendment was satisfied, thereby raising a genuine issue of material fact that precludes summary judgment. Consequently, it is unnecessary at this juncture to address whether the "any or no reason" termination right survived the First Amendment.[4]

---

4. The Court has thoroughly evaluated the parties' arguments concerning the "any or no reason" language. An ambiguity arguably exists as to whether this termination right survived the First Amendment. However, due to the existing ambiguity regarding the satisfaction of the OEA Amendment, it is unnecessary to resolve this issue at the present stage of litigation. The ambiguity over whether the OEA Amendment was satisfied independently precludes summary judgment.

The construction of a written contract is a question of law. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St. 2d 241, 241 (1978), paragraph one of the syllabus. "[C]ommon words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." *Id.* at 245-46. "[W]here the terms in an existing contract are clear and unambiguous, [a] court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Id.* at 246. "However, if a term cannot be determined from the four corners of a contract, factual determination of intent or reasonableness may be necessary to supply the missing term." *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio, Inc.*, 15 Ohio St. 3d 321, 322 (1984).

Ambiguity exists only when a provision at issue is susceptible to more than one reasonable interpretation. *Lager v. Miller-Gonzalez*, 120 Ohio St. 3d 47, 50 (2008). "The purpose of contract construction is to discover and effectuate the intent of the parties. The intent of the parties is presumed to reside in the language they chose to use in their agreement." *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 313 (1996). "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d 216, 219 (2003). "On the other hand, where a contract is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent." *Id.*

*OEA Amendment Satisfaction*

The parties dispute whether StorCo, as of December 20, 2022, could terminate the PSA based on the OEA Amendment provision. 851 Alexis asserts that after the execution of the First and Third Amendments, "[t]he only ground for cancellation available to Plaintiff when the notice was sent was the inability of plaintiff to obtain the consent of the other owners in the development

17

to an amendment of the OEA to explicitly allow the use of the subject property as a self-storage business. That this condition was already met is beyond dispute." (Doc. 15, at 16). StorCo responds that the OEA condition was never satisfied. (Doc. 25, at 19). Because the Court finds questions of material fact exist as to whether the OEA Amendment was satisfied, 851 Alexis is not entitled to summary judgment on this basis.

The Third Amendment was executed on September 21, 2022. It extended the Inspection Period to allow StorCo to continue to seek permission to remove the warehouse prohibition until December 20, 2022, at 5:00 p.m. (Doc. 25-1, at ¶ 7); (Doc. 23, at § 2a). The relevant language of the Third Amendment is:

> a. Notwithstanding anything contained in the Agreement to the contrary as used in the Agreement and any exhibit thereto, the term **"Inspection Period"** shall have the following meaning: a period commencing on the Effective Date and expiring at 5:00 o'clock p.m. Eastern on Tuesday, December 20, 2022, provided, however, the Inspection Period is extended for the sole and exclusive purpose for Buyer, at its sole cost and expense, to seek satisfaction of the O.E.A. Condition from the Owners.

***

> c. Notwithstanding anything contained in the Agreement to the contrary, as used in the Agreement, and any exhibit thereto, the term, the term (sic) **"Closing Date"** shall mean the date that is the earlier of: (i) fifteen (15) days following the date the O.E.A. Amendment is recorded in the Office of the Lucas County Recorder of Deeds; or (ii) Friday, December 30, 2022.

> d. The O.E.A. Amendment shall be prepared by Buyer, at Buyer's sole cost, and submitted to Seller for Seller's reasonable review and approval. Buyer shall diligently seek to secure the original, notarized signatures of the parties listed on the attached Exhibit "A" and keep Seller apprised of its efforts to do the same. Upon receipt of a fully executed and notarized O.E.A. Amendment, Buyer's counsel shall provide the original to Seller's counsel for recording with the Lucas County Recorder of Deeds.

(Doc. 23, at § 2).

18

The Court's first step is to determine whether the contract is ambiguous. The Court finds the language of the Third Amendment ambiguous because it is susceptible to more than one reasonable interpretation. *Lager*, 120 Ohio St. 3d at 50.

The Third Amendment states: "the Inspection Period is extended for the sole and exclusive purpose for Buyer, at its sole cost and expense, to seek satisfaction of the O.E.A. Condition from the Owners." 851 Alexis asserts this language is satisfied because the Owners had "agreed" to remove the prohibition (albeit at a cost). (Doc. 26, at 12); (DeWood Depo., at 58-59). Therefore, 851 Alexis argues that the clause was satisfied when the Owners agreed, and StorCo breached the PSA when it did not perform. StorCo, on the other hand, highlights that subsections (c) and (d) of the Third Amendment provide additional steps that the parties were required to undertake to complete the OEA Amendment. These steps include the execution of the Amendment (c) and its recording with the Lucas County Recorder of Deeds (d). (Doc. 25, at 18).

A contract is ambiguous when it cannot be given a "definite legal meaning." *Westfield Ins. Co.*, 100 Ohio St.3d at 219. In this case, the terms under review do not give rise to a "definite legal meaning". Upon reviewing the Third Amendment as a whole, particularly the "seek satisfaction" clause and subsections (c) and (d), the Court finds the language ambiguous because it cannot be given a definite legal meaning and is susceptible to more than one reasonable interpretation. On the one hand, 851 Alexis argues the plain language in the Third Amendment's terms is met once StorCo obtained the necessary permission from the Owners. Conversely, StorCo asserts the existence of additional stipulated steps in the Amendments Amendment (subsections (c) and (d)) that had not been completed led to an interpretation that these were also prerequisites for the removal of the prohibition. Ultimately, white the Court does not endorse a particular interpretation, it does find both interpretations are reasonably supported based on the language of the Third

Amendment. Because ambiguity exists as to the PSA and Third Amendment, this Court must examine the parties' conduct and facts on the record. Courts may only examine extrinsic evidence to ascertain the parties' intent if the contract is ambiguous. *Shifrin v. Forest City Enters.*, 64 Ohio St. 3d 635, 638 (1992).

In examining the parties' conduct, 851 Alexis's primary argument is that StorCo succeeded in gaining the Owners' approval to remove the warehouse prohibition; it was simply at a price StorCo was unwilling to pay. (Doc. 26, at 11-12). StorCo responds that there was "no reason to believe this transaction could plausibly close in the manner contemplated". (Doc. 25, at 19). It lists the following outstanding issues:

> (1) StorCo was demanded to compensate the owners an amount totaling nearly fifteen percent of the original purchase price to receive permission to use the space as intended; (2) StorCo never agreed to Kroger's $75,000 demand; (3) no agreed-upon amendment was reduced to writing and executed; (4) no amendment was, or could be, filed with the Lucas County Recorder of Deeds; (5) the parties verbally discussed multiple price adjustments, yet agreed on none of them; (6) the parties actively discussed alternative financing options; (7) there were "a lot of unknowns" in the parties' discussions, leading DeWood to believe the deal was beginning to fall apart before he received the Termination; and (8) Wheeler informed McFarland DeWood was going to try and secure the removal of the Prohibition himself.

*Id.*

Preliminarily, as to the financial demands, StorCo argues, "[t]here is simply no logical argument to be made that StorCo was required to concede to any and all demands made by the Owners, regardless of the terms, even when drastically altering the financials of the underlying transaction." (Doc. 25, at 19). The Court disagrees based on the unambiguous language of the First and Third Amendments: "the Inspection Period is extended for the sole and exclusive purpose for Buyer, **at its sole cost and expense**, to seek satisfaction of the OEA Condition from the Owners." (Doc. 23, at § 2a) (emphasis added). However, despite StorCo agreeing to bear these costs, other outstanding issues, namely the additional steps outlined in the Third Amendment and an email

20

exchange between McFarland and Wheeler, create an issue of material fact as to whether the OEA Amendment was satisfied.

First, the OEA Amendment was not executed and therefore could not be filed with the Lucas County Recorder of Deeds. This step was explicitly required by the Third Amendment and its absence raises a genuine dispute.

Second, several email exchanges between the parties show ongoing negotiations regarding the satisfaction of the OEA Amendment. In support of its assertion that the OEA Amendment was satisfied, 851 Alexis points to an email exchange between McFarland and Wheeler on December 14, 2022. In the email, McFarland stated:

> Seller has already reviewed and approved the initial draft of the OEA Amendment so to the extent they no longer have a copy, see attached. The basic terms of the negotiated concessions are; reduce parking to 3.5 per 1000 sq. ft.; increase Target allowable building size; and allow mini-warehouse use on Lot 7. We can provide them with a revised draft with those negotiation concessions after a PSA amendment is executed.

> Drafting the amendment won't take long. We could have that ready in the next day or two. Circulating may take some time especially for Target and Kroger. To be safe, I think we'd need about 45-60 days to secure the execution and return of the OEA Amendment from the various parties, but with the holidays coming up, it almost would be better if we could get the 45-60 days to start on January 3, it being the first business day of the new year.

(Doc. 16, at 4). In response, StorCo points to Wheeler's email to McFarland when he requested McFarland forward the contact information for the Owners' representatives who were parties to the OEA in case DeWood might "decide to finalize the self storage matter on his own." (Doc. 25-2, at ¶ 12). If the OEA Amendment was indeed satisfied, there would be no need for DeWood to "finalize" the matter himself. Ultimately, the Court finds the above emails further confirm a dispute of a material fact as to whether the OEA Amendment was satisfied. On one hand, StorCo says it approved the OEA Amendment and that it will be ready to close within 45-60 days. On the

21

other hand, 851 Alexis asked for the Owners' contact information so DeWood could take further action to finalize the OEA Amendment.

Consequently, after considering the parties' conduct and facts on the current record, the Court finds disputes of material fact exist as to whether the OEA Amendment was satisfied. 851 Alexis has therefore not demonstrated its entitlement to summary judgment.

CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendant's Motion for Summary Judgment (Doc. 15) be, and the same hereby is, DENIED.


 s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: July 17, 2024